

**FILED**

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

2008 MAY -5  AM 10: 34

U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS. FLORIDA

LORI J. ALDRIDGE individually and as Trustee
of THE LOST RIDGE 332 REVOCABLE LAND
TRUST and as Trustee of THE LOST RIDGE 125 REVOCABLE
LAND TRUST; STEPHEN R. ALDRIDGE; ERIC ALMACEN;
LEILANI ALMACEN; DEREK BENSON, ANTHONY
BROWN; ELLEN P. BROWN; THAO CAM; DRAKE
CONTI; DONNA P. CLAY-CONTI ; ROBIN GARELICK;
JOSE GONZALES; RUMA GONZALES; LOWANA M. GOOCH;
JOANN HENSCHEN; STEPHEN E. HERRITT; LINDA M.
HERRITT; THOMAS HERRITT, JR.; THOMAS A.
HERRITT, SR.; HOWARD K. HICKS, JR.; LORA HINCHCLIFF;
ROBERT V. JO; CONNIE H. JO; DAVID L. MINTON;
CHRISTINA MINTON; EDWARD NABAKOWSKI; RAY
NARIO; ROSA P. NARIO; JAY RICKLES; JOHN H. ROBINSON;
GARY C. STILWELL; GAIL THORSEN; PAUL D. THORSEN;
PETER WINSTON; BRIAN YOUNG and GEORGE A. ZIRKLE
individually, and on behalf of all others similarly situated,

2: _08_ -C _V_- _359_ -FtM-_345PC_

Plaintiffs,

v.                                                   **CLASS ACTION COMPLAINT**

PREMIUM CONNECTIONS, INC., a Georgia
Corporation, a/k/a PCI HOMES PROGRAM,
VILLA REALTY GROUP, INC., a Florida Corporation,
a/k/a PLATINUM PROPERTIES BY VILLA HOMES;
BUILD A HOME, LLC, a Florida Corporation,
HGS FINANCIAL SERVICES, LLC, a Florida Corporation,
OPM MILLIONAIRE, LLC, an Alaska LLC, a/k/a
CAPE CORAL MILLIONAIRE,
LIFESTYLE HOME RENTALS, LLC, a revoked Nevada LLC,
by and through its Manager, KARLA RAINWATER;
PATRICK HUTTON, Individually, LYNN HUTTON,
Individually, JOHN FRENCH, Individually,
JOHN PARKE, Individually, EVONNE ECKENROTH,
Individually, CHRISTOPHER J. CANZANO, Individually,
RICHARD JOSEPH CANZANO, Individually, STEPHEN
ANTHONY CANZANO, Individually, BAYWOOD
CONSTRUCTION, INC., a Florida Corporation;
CHARLES FLETCHER, Individually, ALICE FLETCHER,
Individually, MICHAEL J. DEVITO, Individually, UNITED

MORTGAGE CORPORATION, a Florida Corporation;
METROCITIES MORTGAGE, LLC, d/b/a OPTEUM FINANCIAL
SERVICES, a Delaware LLC; JM TITLE CORPORATION, a
Florida Corporation; JM LENDING GROUP, INC., d/b/a
CAPE LENDING GROUP, a dissolved Florida Corporation, by
and through its director JAMES SVENDSEN and JAMES
SVENDSEN, individually; NATIONAL CITY CORPORATION,
a Delaware Corporation; KEVIN CARAOTTA, Individually,
LAURA CARAOTTA, Individually, SCOTT SAX, Individually,
JONATHAN BLAZE, Individually; COAST BANK OF FLORIDA,
a Florida Corporation, SAGE APPRAISAL ASSOCIATES, INC.,
a Florida Corporation, TAMMY STURTEVANT, Individually,
SOUTHERN APPRAISAL SERVICES, INC., a Florida Corporation,
HEATHER KABOBEL, Individually NETWORK APPRAISAL SERVICES,
INC., a Florida Corporation; REAL PRO, LLC., a Florida Corporation;
DAVID WITTIG, Individually; KEVIN ROSS, Individually; MIKE PAPP,
Individually; LISA WILSON, Individually and DOES 1-100;

                Defendants.

_____/

Plaintiffs, LORI J. ALDRIDGE individually and as Trustee of THE LOST RIDGE 332

REVOCABLE LAND TRUST and as Trustee of the Lost Ridge 125 Revocable Land Trust;

STEPHEN R. ALDRIDGE; ERIC ALMACEN; LEILANI ALMACEN; DEREK BENSON,

ANTHONY BROWN; ELLEN P. BROWN; THAO CAM; DRAKE CONTI; DONNA P. CLAY-

CONTI; ROBIN GARELICK; JOSE GONZALES; RUMA GONZALES; LOWANA M. GOOCH;

JOANN HENSCHEN; STEPHEN E. HERRITT; LINDA M. HERRITT; THOMAS HERRITT,

JR.; THOMAS A. HERRITT, SR.; HOWARD K. HICKS; LORA HINCHCLIFF; ROBERT V. JO;

CONNIE H. JO; DAVID L. MINTON; CHRISTINA MINTON; EDWARD NABAKOWSKI;

RAY NARIO; ROSA P. NARIO; JAY RICKLES; JOHN H. ROBINSON; GARY C. STILWELL;

GAIL THORSEN; PAUL D. THORSEN; PETER WINSTON; BRIAN YOUNG and GEORGE A.

ZIRKLE and on behalf of all others similarly situated, ("Plaintiffs"), by and through their

undersigned counsel, sue Defendants, PREMIUM CONNECTIONS, INC., a Georgia Corporation,

a/k/a PCI HOMES PROGRAM, VILLA REALTY GROUP, INC., a Florida Corporation, a/k/a

PLATINUM PROPERTIES BY VILLA HOMES; BUILD A HOME, LLC, a Florida Corporation,

HGS FINANCIAL SERVICES, LLC, a Florida Corporation, OPM MILLIONAIRE, LLC, an

Alaska LLC a/k/a CAPE CORAL MILLIONAIRE, LIFESTYLE HOME RENTALS, LLC, a

revoked Nevada LLC, by and through its Manager KARLA RAINWATER, PATRICK HUTTON,

Individually, LYNN HUTTON, Individually, JOHN FRENCH, Individually, JOHN PARKE,

Individually, EVONNE ECKENROTH, Individually, CHRISTOPHER J. CANZANO,

Individually, RICHARD JOSEPH CANZANO, Individually, STEPHEN ANTHONY CANZANO,

Individually, BAYWOOD CONSTRUCTION, INC., a Florida Corporation; CHARLES

FLETCHER, individually, ALICE FLETCHER, Individually, MICHAEL J. DEVITO,

Individually, UNITED MORTGAGE CORPORATION, a Florida Corporation, METROCITIES

MORTGAGE, LLC d/b/a OPTEUM FINANCIAL SERVICES, a Delaware LLC, JM TITLE

CORPORATION, a Florida Corporation; JM LENDING GROUP, INC., d/b/a CAPE LENDING

GROUP, a dissolved Florida Corporation, by and through its director JAMES SVENDSEN and

JAMES SVENDSEN, individually; NATIONAL CITY CORPORATION, a Delaware Corporation;

KEVIN CARAOTTA, Individually, LAURA CARAOTTA, Individually, SCOTT SAX,

Individually; JONATHAN BLAZE, Individually; COAST BANK OF FLORIDA, a Florida

Corporation, SAGE APPRAISAL ASSOCIATES, INC., a Florida Corporation, TAMMY

STURTEVANT, Individually, SOUTHERN APPRAISAL SERVICES, INC., a Florida

Corporation, HEATHER KABOBEL, Individually; NETWORK APPRAISAL SERVICES, INC., a

Florida Corporation; REAL PRO, LLC., a Florida Corporation; DAVID WITTIG, Individually;

KEVIN ROSS, Individually; MIKE PAPP, Individually;  LISA WILSON, Individually and DOES

1-100 for, inter alia, federal securities fraud, breach of contract, breach of the implied covenant of good faith and fair dealing, and violations of the Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1701 et seq. ("ILSFDA"), and Florida's Deceptive and Unfair Trade Practices Act, Florida Statutes , § 501.201 et. seq. ("FDUTPA"), in connection with the offering and sale of real estate investment opportunities in Lee County, Florida, and allege as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77v(a) and Section 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78aa. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) as this matter is a class action with an amount in controversy that exceeds Thirteen Million Five Hundred Thousand xx/100 ($13,500,000.00) Dollars. This Court has supplemental jurisdiction over all other claims, including the state law claims, in accordance with the provisions of 28 U.S.C. § 1367.

2. Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(1) and (b)(1) as the defendants' principal place of business (in the case of the corporate defendants) or principal residence (in the case of the individual defendants) is in this District and defendants are otherwise subject to personal jurisdiction here. Venue is also proper in this district because defendants' acts and omissions constituting violations of the federal securities laws occurred here.

3. The Defendants, directly and indirectly, have made use of the means and instrumentalities of interstate commerce, the means and instruments of transportation and communication in interstate commerce, and the mails, in connection with the acts and practices, and courses of business set forth in this Complaint.

4.    Plaintiffs demand a trial by jury on each and every one of their claims as pled herein.

5.    All conditions precedent to the initiation and maintenance of this action have been performed or have occurred.

## THE PARTIES

### *The Plaintiffs*

6.    Plaintiff, LORI J. ALDRIDGE and Plaintiff, STEPHEN R. ALDRIDGE (collectively they shall be referred to herein as "the ALDRIDGES"), are a married couple whose primary residence is 112 Leslie Drive, Newport News, Virginia 23606.

7.    Plaintiffs ERIC ALMACEN and LEILANI ALMACEN (collectively they shall be referred to herein as "the ALMACENS"), are a married couple whose primary residence is 1415 Lomita Blvd., Unit 1, Harbor City, California 90710.

8.    Plaintiff, DEREK R. BENSON ("BENSON"), is an unmarried individual whose primary residence is 2331 N. Hathaway Street, Santa Ana, California 92705.

9.    Plaintiffs, ELLEN BROWN and ANTHONY BROWN (collectively they shall be referred to herein as "the BROWNS"), are a married couple whose primary residence is 2516 Little Cove Road, Owens Crossroads, Alabama 35763.

10.    Plaintiff, THAO "TERI" CAM ("CAM"), is an unmarried individual whose primary residence is 2250 Monroe Street, Apt. 319, Santa Clara, California 95050.

11.    Plaintiffs, DRAKE CONTI and DONNA P. CLAY-CONTI (collectively they shall be referred to herein as "the CONTIS"), are a married couple whose primary residence is 1 Riviera Court, Oakland, California 94605.

12.     Plaintiff, ROBIN B. GARELICK ("GARELICK"), is a married individual whose primary residence is 729 Charthouse Circle, Hampton, Virginia 23664.

13.     Plaintiffs, JOSE GONZALES and RUMA GONZALES (collectively they shall be referred to herein as "the GONZALES'"), are a married couple whose primary residence is 14056 Olive View Drive, Sylmar, California 91342.

14.     Plaintiff, LOWANA M. GOOCH ("GOOCH'"), is an unmarried individual whose primary residence is 7056 Alder Creek Road, Vallejo, California 94591.

15.     Plaintiff, JOANN HENSCHEN ("HENSCHEN"), is a married individual whose primary residence is 945 Summit Avenue, Cincinnati, Ohio 45246.

16.     Plaintiffs, STEPHEN E. HERRITT and LINDA MARIE HERRITT (collectively they shall be referred to herein as "the HERRITTS"), are a married couple whose primary residence is 778 W. Ocean View Avenue, Norfolk, Virginia 23503.

17.     Plaintiff, THOMAS A. HERRITT, JR. ("HERRITT, JR."), is a married individual whose primary residence is 24251 Tidewater Trail, Port Royal, Virginia 22535.

18.     Plaintiff, THOMAS A. HERRITT, SR. ("HERRITT"), is a married individual whose primary residence is 24251 Tidewater Trail, Port Royal, Virginia 22535.

19.     Plaintiff, HOWARD K. HICKS, JR. ("HICKS"), is an unmarried individual whose primary residence is 3636 Taliluna Avenue, Apt.# 316, Knoxville, TN 37919.

20.     Plaintiff, LORA HINCHCLIFF ("HIINCHCLIFF"), is an unmarried individual whose primary residence is 7211 Edgerton Drive, Dallas, TX 75231.

21.     Plaintiffs, ROBERT V. JO and CONNIE H. JO (collectively they shall be referred to herein as "the JOS"), are a married couple whose primary residence is 1181 Langton Drive, San Ramon, California 94582.

Charlip Law Group, LC
Harrison Executive Centre, 1930 Harrison Street, Suite 208, Hollywood FL 33020

22. Plaintiffs, DAVID L. MINTON and CHRSTINA MINTON (collectively they shall be referred to herein as "the MINTONS"), are a married couple whose primary residence is 1141 Kingsbury Drive, Chesapeake, Virginia 23322.

23. Plaintiff, EDWARD N. NABAKOWSKI ("NABAKOWSKI"), is a married individual whose primary residence is 3336 Pebble Beach Road, Grove City, Ohio.

24. Plaintiffs, RAY NARIO and ROSA P. NARIO (collectively they shall be referred to herein as "the NARIOS"), are a married couple whose primary residence is 908 La Palma Place Milpitas, California 95035.

25. Plaintiff, JAY RICKLES ("RICKLES"), is a married individual whose primary residence is 1405 Baffy Loop, Chesapeake, Virginia 23320.

26. Plaintiff, JOHN H. ROBINSON ("ROBINSON"), is a married individual whose primary residence is 11748 Terra Bella Street, Stilmar, California 91342.

27. Plaintiff, GARY C. STILWELL ("STILWELL"), is a married individual whose primary residence is 215 Sir Oliver Road, Norfolk, Virginia 23505.

28. Plaintiff, GAIL THORSEN and PAUL D. THORSEN (collectively they shall be referred to herein as the "THORSENS"), are a married couple whose primary residence is 32701 Vivente de Marlita, San Juan Capistrano, California 92675.

29. Plaintiff, PETER WINSTON ("WINSTON"), is a married individual whose primary residence is 4550 Tam Oshanter Drive, Westlake Village, CA 91362.

30. Plaintiff, BRIAN YOUNG ("YOUNG"), is a married individual whose primary residence is 1101 Red Oak Court, Watkinsville, GA 30677.

31. Plaintiff, GEORGE ZIRKLE ("ZIRKLE"), is a married individual whose primary residence is 5517 Glen Cive Drive, Knoxville, Tennessee 37919.

### The Defendants

32.    At all material times hereto, Defendants PREMIUM CONNECTIONS, INC. ("PCI"), PCI HOMES ("PCIH"), VILLA REALTYGROUP, INC ("VILLA"), BUILD A HOME, LLC ("BAH"),  HGS FINANCIAL SERVICES, LLC ("HGS"), OPM MILLIONAIRE ("OPM") a/k/a CAPE CORAL MILLIONAIRE ("CCM"),  and  LIFESTYLE  HOME  RENTALS ("LIFESTYLE"), (hereinafter, collectively "PCI/BUILD A HOME TEAM"), were Florida or foreign corporations conducting business in Lee County, Florida.

33.    At all material times hereto, the PCI/BUILD A HOME TEAM were engaged in the sale and marketing of investment properties in Cape Coral, Florida which investment program has been described at various times as "Cape Coral Millionaire;" "PCI Build A Home Program;" "PCI" and "OPM Millionaire" (hereinafter described as the "PCI/OPM MILLIONAIRE Program").

34.    At all material time hereto, Defendant, PATRICK HUTTON ("HUTTON") was a resident of Lee County, Florida and held himself out as the "real estate tycoon" for the PCI/OPM MILLIONAIRE Program, and a Managing Member of BAH and HGS both of which were affiliated with and participated in the activities of PCI/OPM MILLIONAIRE Program.

35.    At all material times hereto, EVONNE ECKENROTH ("ECKENROTH") was the founder and director of PCI, a/k/a PCI HOMES PROGRAM, and LIFESTYLE  and managed day to day activities of the PCI/OPM MILLIONAIRE Program.

36.    At all material times hereto, LYNN HUTTON ("HUTTON") was a Managing Member of BAH.

37.    At all material times hereto, JOHN FRENCH ("FRENCH") was a Managing Member of BAH.

38. At all material times hereto, JOHN PARKE ("PARKE") was a Managing Member of BAH.

39. At all material times hereto, CHRIS CANZANO ("CHRIS") was an individual licensed as a Real Estate Broker under Chapter 475, Florida Statutes and was operating as a Real Estate Broker in Lee County, Florida and is a principal of VILLA.

40. At all times material hereto, CHRIS was neither a seller, buyer, landlord or tenant in any of the transactions described in this Complaint and he acted solely as a licensee in these transactions.

41. At all times material hereto, CHRIS CANZANO ("CHRIS"), RICHARD JOSEPH CANZANO ("RICHARD") and STEPHEN ANTHONY CANZANO ("STEPHEN") (collectively they shall be referred to herein as the "CANZANOS") as well JONATHAN BLAZE ("BLAZE") were all Florida Real Estate licensees under Chapter 475 of Florida Statutes.

42. At all times material hereto the CANZANOS were neither sellers, buyers, landlords or tenants in any of the transactions described in the Complaint and they acted solely in their capacity as real estate licensees in these transactions.

43. Defendants, UNITED MORTGAGE CORPORATION, ("UNITED"), METROCITIES MORTGAGE, LLC d/b/a OPTEUM FINANCIAL SERVICES ("OFS"); COAST BANK OF FLORIDA ("COAST"); NATIONAL CITY CORPORATION ("NATIONAL CITY"); and MARKET STREET MORTGAGE CORPORATION ("MARKET STREET") (hereinafter also sometimes referred to collectively as "the Lender Defendants") were and are at all material times hereto organized corporations authorized to conduct and conducting business in Florida and upon information and belief, principally engaged in mortgage brokering or mortgage lending within the meaning of such under Florida Chapter 494 or Chapters 655 through 667.

44.     PCI/BUILD A HOME TEAM held itself out as a real estate opportunity business with the experience to provide potential investors with the ability to build a new home in Lee County with little or no money down by directing potential investors and specifically Plaintiffs to build with its named builders, in this case BAYWOOD CONSTRUCTION, INC. ("BAYWOOD") or PAUL HOMES, INC. ("PAUL HOMES") through financing provided by and/or through UNITED, OFS, COAST, MARKET STREET and/or NATIONAL CITY.

45.     Defendant BAYWOOD is currently, and at all times herein was, a duly organized Florida corporation, formed on or about September 22, 1986 having principal place of business at 534 SE 16th Place, Cape Coral, FL 33990.

46.     Defendant PAUL HOMES is currently a duly organized Florida corporation, formed on or about September 22, 1986 having principal place of business at 4524 SE 16 PL, #2C CAPE CORAL FL 33904.

47.     Defendants CHARLES FLETCHER ("CHARLES"), ALICE FLETCHER ("ALICE"), and MICHAEL J. DEVITO ("MICHAEL"), were and are the only officers of BAYWOOD and were, at all times material hereto, actively involved with the transactions of the PCI/BUILD A HOME TEAM.

48.     The PCI/BUILD A HOME TEAM had a business relationship with BAYWOOD, where by the PCI/BUILD A HOME TEAM marketed BAYWOOD to Plaintiffs as a builder who could construct Plaintiffs' houses for a "reduced" cost of construction within a limited timeframe, although PCI knew, or should have known, that BAYWOOD could not or would not construct Plaintiffs' houses within the limited timeframe and that the construction cost of the subject houses was not "reduced" but rather was "inflated" to the point where BAYWOOD was making enough

profit to volunteer payment of the Plaintiffs' construction loan interest for a one (1) year period during construction.

49.     Defendant CHARLES is and was the President of BAYWOOD.

50.     Defendant ALICE is and was the Vice President of BAYWOOD.

51.     Upon information and belief JM TITLE CORPORATION ("JM") is or was at all times material hereto a Florida licensed title insurance agency licensed and governed under Chapter 626, Florida Statutes.

52.     Defendant, MICHAEL is and was the Vice President of BAYWOOD and an officer of JM and is in his capacity as an officer of JM governed under Chapter 626, Florida Statutes.

53.     Defendant JAMES A. DEVITO, JR. ("JAMES") is and was the President of JM and is in his capacity as an officer of JM governed under Chapter 626, Florida Statutes.

54.     Defendant, UNITED is currently a duly organized Florida corporation, formed on or about July 6, 1999, having a principal place of business at 1505 SW 40th Street, Cape Coral, FL, 33904.  Defendants KEVIN CARAOTTA ("KEVIN"), LAURA CARAOTTA ("LAURA") and SCOTT SAX ("SCOTT") were and are the three only members of UNITED.

55.     Defendant KEVIN was at all material times and is currently a resident of Cape Coral, Lee County, Florida and was and is the President of UNITED and was actively involved with the transactions of PCI/BUILD A HOME TEAM.

56.     Defendant LAURA was at all material times and is currently a resident of Cape Coral, Lee County, Florida and was and is actively involved with the transactions of UNITED and the PCI/BUILD A HOME TEAM, and specifically with the Plaintiffs.

Charlip Law Group, LC
Harrison Executive Centre, 1930 Harrison Street, Suite 208, Hollywood FL 33020

57.    Defendant SCOTT was at all material times and is currently President and Director of UNITED and was and is actively involved with the transactions of the PCI/BUILD A HOME TEAM, and specifically with the Plaintiffs.

58.    Defendant, OFS was and is at all material time hereto a Delaware corporation having its principal place of business at W 115 CENTURY ROAD, PARAMUS NJ 07652.

59.    Plaintiffs have reason and belief that OFS was and is formed for the sole purpose of moving assets from the parties in privity with Plaintiffs and thus is a proper and indispensable party to this action.

60.    Defendants SAGE APPRAISAL ASSOCIATES, INC. ("SAGE"), SOUTHERN APPRAISAL SERVICES, INC. ("SOUTHERN"), NETWORK APPRAISAL SERVICES, INC. ("NETWORK"), and REAL PRO, LLC. ("REAL") are all Florida corporations that are currently, and at all times material hereto in the business of performing real estate appraisals in Lee County, Florida.

61.    Defendants DAVID WITTIG ("WITTIG"), KEVIN ROSS ("ROSS"), MIKE PAPP ("PAPP"), LISA WILSON ("WILSON"), TAMMY STURTEVANT ("STURTEVANT") and HEATHER KABOBEL ("KABOBEL") are all individuals that are currently, and at all times material hereto were licensed to perform real estate appraisals in the State of Florida either as registered appraisers or licensed apprentices.

62.    Defendant, JM LENDING GROUP, INC., d/b/a CAPE LENDING GROUP, a dissolved Florida Corporation, by and through its director JAMES SVENDSEN (hereinafter "CAPE") was for all times material hereto a Florida licensed mortgage broker whose director was JAMES SVENDSEN ("SVENDSEN").

63.     The true names and capacities, whether individual, corporate, associate, governmental or otherwise, of defendants DOES 1 through 100 are unknown to plaintiffs at this time. Plaintiffs therefore sue said defendants by such fictitious names. When the true names and capacities of said defendants have been ascertained, plaintiffs will amend this complaint accordingly. Plaintiffs are informed and believe, and on that basis allege, that each defendant designated herein, including each DOE, is responsible, willfully, negligently, or in some other actionable manner, for the events and happenings, and violations of Florida and federal laws, hereinafter alleged, and that they thereby caused plaintiffs harm and monetary losses and damages.

64.     Plaintiffs allege on information and belief that at all times relevant hereto each of the defendants was the agent, servant, employee, joint-venturer, partner, successor-in-interest, and/or coconspirator of each other defendant and was at all said times acting in the full course and scope of said agency, service, employment, joint venture, concert of action, partnership, successorship, or conspiracy.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### A.     THE INVESTMENT SCHEME CONCOCTED BY THE PCI/BUILD A HOME TEAM

65.     On a date unknown to Plaintiff, PCI/BUILD A HOME TEAM, ECKENROTH, HUTTON,VILLA REALTY, UNITED, KEVIN, LAURA and SCOTT agreed to enter into and did in fact enter into a common and joint enterprise or scheme to offer, market and sell to members of the public through, among other media, the Internet, seminars on real estate investments using various real estate agents and brokers with contacts across the country.  In furtherance of such scheme or enterprise, the PCI/BUILD A HOME TEAM offered to potential investors a plan where they would arrange for and broker construction loan financing for, and construct a residential home

with little to no money down. PCI/BUILD A HOME TEAM further represented to its potential investors that they would build the dwelling with "little to no cost out of pocket" They crafted the financial package to include ten to thirteen months of construction loan payments in the financing package and assured Plaintiffs that the house would be completed long before this period lapsed.

66.     VILLA is one of the largest real estate brokerage firms in Lee County. It offers a variety of residential and commercial real estate brokerage services, including the "PCI Homes Program " for prospective investors.

67.     The CANZANOS were licensees licensed as real estate associates with VILLA and were familiar with the Lee County area and took listings from prospective sellers of land in the Lee County area.

68.     The PCI/BUILD A HOME TEAM held seminars, conference calls and other meetings to entice prospects to invest. During these conferences elaborate scripts were prepared. The scripts contained such "pitches" and representations as: "…become a passive real estate investor in Lee County, Florida enjoying the beauty of 70 to 100% returns within one year on your leveraged invested capital…."

69.     The PCI/BUILD A HOME TEAM enticed potential investors with an investment scheme by misrepresenting or falsifying information depicting a "hot" real estate market in Cape Coral, Florida, using news stories and the Internet to bolster their claims. PCI/BUILD A HOME TEAM   required all potential investors to use their named Builder (here BAYWOOD) as the builder, and UNITED as the Mortgage Broker, ensuring that various entities within the scheme would take a portion of the potential investors' money up front, performing little or no service for the potential investor.

70. The PCI/BUILD A HOME TEAM paid prospective investors including some of the Plaintiffs to attend seminars in the Cape Coral area that included presentations by the builder, title company, the lenders and themselves – this was referred to as their "Fly & Buy Program."

71. The investors targeted by the PCI/BUILD A HOME TEAM were anyone with a credit score over 700 who had $5900 to invest and assets equal to or greater than 14% of the cost to construct the investment residence.

72. The PCI/BUILD A HOME TEAM was able to "cast a wide net" to acquire investors by virtue of the "aggressive investor financing" loan programs that their lenders – COAST BANK; NATIONAL CITY and MARKET STREET were offering their investors – "SIVA" - stated income, verified assets or "NIVA" – no income, verified assets.

73. The participating lenders played a vital role in the investment process because the first step to a potential investor participating in the program was to be "pre-qualified" by the lender. Once pre-approved, The PCI/BUILD A HOME TEAM selected a vacant lot and home build-out package for the investor, contracted their builder, and then submitted the "investor" to the lender for further approval.

74. One of the foundational sales pitches made at these seminars was the notion of "instant equity" that prospective investors including the Plaintiff would derive upon participation in the PCI/BUILD A HOME TEAM PROGRAM.

75. A vital component to the "instant equity" sales pitch was the participation of the lender – NATIONAL CITY in the seminar. NATIONAL CITY represented its loan guidelines as requiring at least a 90% loan to value ("LTV") ratio before it would extend a construction to perm loan. As a result, the lender's acceptance, enthusiasm, presence and active participation constituted

a reassurance and acknowledgment of the "instant equity" the PCI/BUILD A HOME TEAM represented.

76.     The scheme depended upon the ability of the PCI/BUILD A HOME TEAM being able to maintain that the lender would not provide this loan were the value of the completed property not as they represented it to be and that the real estate market in Cape Coral would facilitate the profitable resale or rental of the homes they induced the plaintiffs to purchase.

77.     Once investors were "pre-approved," the lender would even follow-up with the potential investor to attempt to encourage the sale.

78.     As part of its seminar presentation NATIONAL CITY represented that it utilized a "round robin" system of selecting appraisers.

79.     The PCI/BUILD A HOME TEAM represented to investors such as the Plaintiffs that the land acquisition was being made at below market values and that the construction was being performed at a "discount", a claim which while untrue could only be ratified through the cooperation of one or more appraisers that would represent what the PCI/BUILD A HOME TEAM needed them to represent..

80.     Notwithstanding PCI/BUILD A HOME TEAM'S representations, and NATIONAL CITY'S endorsement of those claims, the land which the PCI/BUILD A HOME TEAM selected for and directed the "investors" to purchase not only did not possess "instant equity", they were in many cases properties which had been previously listed by VILLA REALTY and particularly the CANZANOS and which VILLA REALTY had been unable to sell and even then the PCI / BUILD A HOME TEAM not only recommended, provided, required and endorsed the properties, in many cases the properties "sold" to Plaintiffs for amounts in excess of their listing price and well in excess of any reasonable assessment of their value

81.    Indeed, though the PCI / BUILD A HOME TEAM did not disclose this to the Plaintiffs, there was such an abundance of "profit" in the transaction including the PCI/ BUILD A HOME TEAM'S "Assignment Fee" (which ranged between $8,000.00 and $10,000.00) for the PCI / BUILD A HOME TEAM, that BAYWOOD actually paid the first year's interest on the eventual construction loan.

82.    When certain Plaintiffs challenged the PCI/BUILD A HOME TEAM regarding the seemingly higher land acquisition prices (such as, for example Plaintiff GARELICK), they were told that the reason for that was that the lots provided by the PCI/BUILD A HOME TEAM were already "pre-permitted" for construction of single family homes.

83.    When Plaintiffs asked the PCI/BUILD A HOME TEAM if they could acquire their own lots, rather than the lost selected by the PCI/BUILD A HOME TEAM and participate in the program, they were also refused.

84.    The PCI/BUILD A HOME TEAM added numerous costs, expenses and fees to artificially raise the total acquisition cost of the completed properties to their benefit. When the PCI/BUILD A HOME TEAM was challenged by Plaintiffs (such as, for example Plaintiff GARELICK) on the costs, expenses and fees and certain Plaintiffs asked to procure their own financing, they were told that outside lenders acquired by a Plaintiff could not participate in the program.

85.    The PCI/BUILD A HOME TEAM  as well as the Lender, NATIONAL CITY also represented to prospective investors including some of the Plaintiffs that the day the construction loan modified to a permanent loan, a Home Equity Line of Credit "HELOC" would be available to enable them to "cash-out" on their "instant equity."

86.     The experience of Plaintiff HENSCHEN is illustrative: In August, 2006, the NATIONAL CITY representative, Jody Valvo, as part of her seminar presentation offered a "construction-perm. loan with a 100% HELOC on the back end." Valvo explained that what that would have afforded HENSCHEN is a HELOC loan for 100% of the difference between the appraised value of the home, in her case – Five Hundred Eighty Five Thousand xx/100 ($585,000) Dollars and the amount of her first mortgage Four Hundred Sixty Eight Thousand xx/100 ($468,000) Dollars, or a One Hundred Seventeen Thousand xx/100 ($117,000) Dollar HELOC. The availability of this HELOC loan was vital to HENSCHEN and the other similarly situated Plaintiffs because, in HENSCHEN'S case for example, her monthly carrying costs for the house were approximately Thirty Five Hundred xx/100 ($3,500.00) Dollars, and she did not anticipate receiving anywhere near that amount in net monthly rental income. Thus, the sales pitch made to all of the potential investors, including the Plaintiffs who financed with NATIONAL CITY was that this HELOC could be utilized to make the negative cash flow payments until the property could be sold for a profit.

87.     When HENSCHEN was approved for financing she was specifically told by Valvo that she would receive the HELOC once the house was completed. This was a material misrepresentation upon which HENSCHEN and similarly situated Plaintiffs relied.

88.     In reliance upon that representation, HENSCHEN moved forward with the acquisition and construction, however once the house was complete NATIONAL CITY refused to provide HENSCHEN with the promised HELOC. Now HENSCHEN is saddled with a first mortgage of Four Hundred Sixty Eight Thousand xx/100 ($468,000) Dollars with an Eight point Eight Seven Five Percent (8.875%) interest rate and a monthly payment of more than Four Thousand ($4,000.00) Dollars.

89.     HENSCHEN, like other similarly situated Plaintiffs and putative class members, have no financial ability to fund the negative cash flow payments and thus is faced with losing the property in foreclosure along with the money she invested as well as her previously good credit rating.

## B.     THE APPRAISAL SCAM

90.     Starting in late 2005/early 2006, the value of new Cape Coral residences, particularly those built for speculation, collapsed relative to the pre-construction contract prices obtained earlier that year. Where buyers became aware of the falling property values, they abandoned the transactions before the close of escrow, or extracted a large price concession. In order to conceal the declining values and close pending sales, the PCI/BUILD A HOME TEAM and its affiliated lenders including NATIONAL CITY conspired with affiliated appraisers to generate fraudulent appraisal reports.

91.     The manifestations of this fraud on the face of these appraisal reports include:

a.      False comparable sales data: statements that comparable houses had recently sold for one price when they had in fact recently sold for another much lower price;

b.      The selection of distant, dissimilar properties as comparable sales instead of numerous available neighboring, identical comparable sales (because the latter could not support at-value appraisal reports);

c.      The use of pending (as opposed to closed) transactions as comparable sales, including when no sale was actually pending because the ostensible buyer had already abandoned the transaction;

     d.    Patently defective and circular appraisal methodology;

     e.    False and misleading statements regarding market factors and conditions.

92.    The appraisers' use of such unverified information and patently faulty methodology demonstrates their complicity in the scheme. In contrast, when independent appraisers looked at public records and performed retrospective appraisals utilizing truly comparable properties, they appraised at values over 40% less!

93.    Indeed, the glaring deficiencies of the appraisals were either deliberate or would have been obvious upon the most cursory of due diligence by NATIONAL CITY, PCI / BUILD A HOME TEAM and the other affiliated lenders involved in the "program".

94.    Defendants' unlawful practices are demonstrated herein with reference to the example of Plaintiffs the BROWNS. The BROWNS purchased two properties from the PCI/BUILD A HOME TEAM. The first property was located at 2840 NW 26th St. Cape Coral, Fl.

95.    The original appraisal was performed by defendants SOUTHERN and KABOBEL with an effective date of October 31, 2005. That appraisal lists the value of the pre-construction lot and "Camelot II" home as Five Hundred Ninety Three Thousand Two Hundred Ninety xx/100 ($593,290) Dollars by cost approach, Five Hundred Ninety Thousand xx/100 ($590,000) Dollars by sales comparison approach and Five Hundred Seventy Four Thousand Two Hundred xx/100 ($574,200) Dollars by income approach. The comparable properties utilized were 8.83 miles; 4.21 miles; 2.13 miles; 1.44 miles; 1.32 miles and 2.34 miles from the subject property. This appraisal utilizes two homes as "comparable homes" that are mere listings; two homes that are 4.21 and 8.83 miles from the subject property; and two homes that are gulf access lots as compared to the subject property which was a fresh water lot.

96.     Based upon the appraisal and other representations of Defendants, the BROWNS entered into an assignment of contract for their lot purchase and a construction agreement with PAUL HOMES on December 9, 2005.

97.     The BROWNS paid One Hundred Thirty Eight Thousand Sixty Seven xx/100 ($138,067) Dollars for their lot and Three Hundred Ninety Thousand Seven Hundred Fifty xx/100 ($390,750) Dollars for the home construction for a total as built package price of Five Hundred Twenty Eight Thousand Eight Hundred Seventeen xx/100 ($528,817) Dollars.

98.     COAST BANK was the lender that approved the loan for this property in the amount of Four Hundred Seventy Two Thousand xx/100 ($472,000) Dollars.

99.     In August, 2007, after their home at 2840 NW 26th St. Cape Coral, Fl. received its certificate of occupancy in January, 2008, the BROWNS commissioned a retrospective appraisal.

100.     In contrast to the original appraisal, the proximity of the comparable properties were 1 mile; 1.29 miles; 1.12 miles; and 1.5 miles. The retrospective appraisal appraised the value of the pre-construction lot and "Camelot II" home as being worth Three Hundred Thirty Five Thousand Four Hundred xx/100 ($335,400) Dollars by cost approach, and Three Hundred Thirty Two Thousand xx/100 ($332,000) Dollars by sales comparison approach.

101.     Thus, the retrospective appraisal reflected a Two Hundred Fifty Seven Thousand Eight Hundred Ninety xx/100 ($257,890) Dollar difference utilizing the cost approach as compared to the original appraisal, a Forty Three and one-half (43.5%) percent difference in value! The retrospective appraisal reflected a Two Hundred Fifty Eight Thousand xx/100 ($258,000) Dollar difference utilizing the sales comparison approach as compared to the original appraisal, a Forty Three point Seven (43.7%) percent difference in value!

102.    The second property purchased by the BROWNS is located at 611 NW 3rd Pl. Cape Coral, Fl.

103.    The original appraisal was performed by SAGE and STURTEVANT with an effective date of March 30, 2006. That appraisal lists the value of the pre-construction lot and "Kristy 4 BR." home as Five Hundred Two Thousand Thirty xx/100 ($502,030) Dollars by cost approach and Five Hundred Thirty Five Thousand xx/100 ($535,000) Dollars by sales comparison approach. The comparable properties utilized were 3.5 miles; 2 miles; and 1.4 miles from the subject property. This appraisal utilizes two homes as "comparable homes" that are listings; two homes are 4.21 and 8.83 miles from the subject property; two homes are gulf access lots as compared to the subject property which was a fresh water lot.

104.    Based upon the appraisal and other representations of Defendants, the BROWNS entered into an assignment of contract for their lot purchase and a construction agreement with BAYWOOD CONSTRUCTION on April 23, 2006.

105.    The BROWNS paid One Hundred Thirty One Thousand Two hundred Five xx/100 ($131,205) Dollars for their lot and Three Hundred Seventeen Thousand Five Hundred Seventeen xx/100 ($317,517) Dollars for the home construction for a total as built package price of Four Hundred Forty Eight Thousand Seven Hundred Twenty Two xx/100 ($448,722) Dollars.

106.    MARKET STREET was the lender that approved the loan for this property in the amount of ($445,000).

107.    In August, 2007, after their home at 611 NW 3rd Pl. Cape Coral, Fl. received its certificate of occupancy in mid to late 2007, the BROWNS commissioned a retrospective appraisal.

108.    In contrast to the original appraisal, the proximity of the comparable properties were 1.19 miles; 1.29 miles; 1 miles; .39 miles and 1.56 miles. The retrospective appraisal listed the

value of the pre-construction lot and "Kristy 4 BR" home as Three Hundred Twenty Nine Thousand Seven Hundred xx/100 ($329,700) Dollars by cost approach, and Three Hundred Thirty Thousand xx/100 ($330,000) Dollars by sales comparison approach.

109.    Thus, the retrospective appraisal reflected a One Hundred Seventy Two Thousand Three Hundred xx/100 ($172,300) Dollar difference utilizing the cost approach as compared to the original appraisal, a Thirty four point Three (34.3%) percent difference in value! The retrospective appraisal reflected a Two Hundred Five Thousand xx/100 ($205,000) Dollar difference utilizing the sales comparison approach as compared to the original appraisal, a Thirty Eight point Three (38.3%) percent difference in value!

110.    A review of the original appraisal's comparables reveals that the distance of each comparable was misstated. Thus instead of being 3.5 miles; 2 miles; and 1.4 miles from the subject property, the comparables utilized were 6.59; 3.42 and 3.59 miles from the subject property.

## C. "THREE CARD MONTY" BY THE TITLE COMPANY

111.    In order to facilitate the continued obscurity of the structure of the transaction, and to further obscure the falsity of the PCI / BUILD A HOME TEAM'S representations, the PCI / BUILD A HOME TEAM with its affiliated lenders' tacit or active approval, required the "investors" to utilize the services of a particular title company, JM, whose principals were MICHAEL and JAMES.

112.    It was the title company's function, to insure that their were no clouds on title, to confirm to the "investor" and the lender, the identity of the true owner of the property, to prepare the closing documents and ultimately to draft and present a summary of the financial transaction upon a closing statement in a manner which represented to all parties the in-flows and out-flows of monies in an accurate and consistent fashion.

113.    MICHAEL, also the owner of BAYWOOD along with his brother JAMES now controlled the title closing aspect of the transactions and were in a position to manipulate and did in fact manipulate closing statements by providing multiple closing statements containing differing information to different parties in the same transaction.

114.    This also allowed the Defendants to continue to obscure the full scope and extent of the profits made by the parties.

115.    UNITED entered into numerous financial arrangements with individuals, specifically many of the Plaintiffs. Plaintiffs were partnered with the PCI/BUILD A HOME TEAM to UNITED for purpose of buying land and building a home through BAYWOOD.

116.    UNITED, knowing the properties were being purchased for investment purposes (to be completed in 150 days and sold thereafter), nonetheless qualified Plaintiff and numerous other investors for unsuitable mortgages which it knew or should have known were unsuitable and were solely structured to facilitate profit for UNITED.

### D. THE NUMEROUS MISREPRESENTATIONS MADE BY PCI/BUILD A HOME TEAM

117.    The PCI / BUILD A HOME TEAM made numerous misrepresentations to the Plaintiffs in order to attempt to induce them to invest in the PCI/BUILD A HOME PROGRAM. These misrepresentations included the following:

        a.    The properties being marketed and sold were being sold below market value or with a rate of return that would far exceed ordinary expected business returns for this sort of investment;

        b.    The properties were highly marketable and in demand;

        c.    The investor would not lose money and would earn a return of approximately 14%;

d. The properties possessed "instant equity";

e. The Lee County Real Estate market was in high demand and that demand was on the incline;

f. The properties were worth at least what the Plaintiff would be paying for them; and

g. The properties would either yield enough income to cover any expenses or would otherwise appreciate at a rate that would far outpace any expenditure by Plaintiffs.

### E. PLAINTIFFS ENTER INTO PURCHASE AGREEMENTS BASED UPON DEFENDANTS' FALSE PROMISES

118. Based upon the foregoing representations, Plaintiffs all decided to purchase various lots and home packages with some Plaintiffs being induced to purchase multiple investment homes from the PCI/BUILD A HOME TEAM.

119. Each Plaintiff signed an assignment of contract in the form represented by that Assignment of Contract attached hereto and incorporated herein as Exhibit "A".

120. Each Plaintiff signed a construction agreement in the form represented by that Construction Agreement attached hereto and incorporated herein as Exhibit "B".

121. Each Plaintiff's closing documents included separate HUD-1's, one for the land acquisition in the form represented by that HUD-1 attached hereto and incorporated herein as Exhibit "C"; and one for the construction financing of the constructed home in the form represented by that HUD-1 attached hereto and incorporated herein as Exhibit "D".

122. Thus, based on the foregoing representations and disclosures, which included, among other things, (a) (b) and (c) each Plaintiff purchased homes having an aggregate total cost of approximately Thirteen Million Five Hundred Thousand xx/100 ($13,500,000) Dollars.

123. The foregoing representations and disclosures made by the Defendants were materially false and misleading, and were knowingly so at the time they were made and were made with the intent to induce Plaintiffs to purchase the properties described herein.

### F. DEFENDANTS PROCURE CONSTRUCTION FINANCING FOR PLAINTIFFS

124. The purchase agreements for each property required Plaintiffs to obtain interim "construction financing" for the purpose of acquiring the property and constructing a home and improvements thereon, and, then, upon completion of the home, to secure permanent mortgage financing, or an "end-loan," to, inter alia, pay off the interim construction financing loan.

125. Following the execution of the subject purchase agreements, PCI/BUILD A HOME TEAM arranged for Plaintiffs to receive interim construction financing from one of its preferred lenders. The principal amount of each loan would be equal to approximately 100% of the purchase price of each property.

126. However, at the time the Plaintiffs applied for such loans, Plaintiffs had insufficient income and savings as should have allowed Plaintiffs to qualify for a series of construction loans from the same lender. No reasonable lender would make a loan of the size and character as were made by the lender defendants identified herein to any unsophisticated borrower whose income and financial wherewithal was comparable to that of the Plaintiffs.

127. Based on industry underwriting, the property should have "additionally" been analyzed by the Lender Defendants based upon each property's cash flow potential as a rental. This apparently was not done, or was not communicated to the borrower. This omission in underwriting

could be viewed as something that wasn't deemed necessary, or as an overt omission based on the fact that the loan would have been turned down due to insufficient cash flow in the analysis. The property did not, would not, and does not cash flow based on the mortgage balance, market rents and market expenses. This is normal and standard underwriting that should have taken place. With the Lender Defendants making a loan to the Plaintiffs of approximately 100% of cost, it was impossible to cash flow the property to satisfy normal and reasonable underwriting guidelines.

128.    To pacify federal regulators and make it appear that the loans were in accordance with underwriting guidelines, the Lender Defendants and/or Defendants UNITED, OPTEUM, CAPE and/or SVENDSEN would structure the transactions such that husbands and wives were purchasing the properties separately and the Defendants were misstating Plaintiffs' income to further support Plaintiffs' loan applications. In many cases, the Plaintiffs were unaware of what they were signing and unaware of what Defendants had done.

129.    In those cases where Plaintiff did catch an "error", they were advised by JM to initial the change; however, upon information and belief, Plaintiffs allege that initialed changed documents were ultimately destroyed, and were never returned to the lender. Even where the Plaintiffs caught and corrected errors on the applications that were prepared for their signature, those changes which they made, initialed and returned were not incorporated into the final documents presented as part of the loan closing package.

130.    Despite the obvious inability of Plaintiffs to satisfy loans of the magnitude involved here, the PCI/BUILD A HOME TEAM'S "hand-picked" lenders approved Plaintiffs' construction loan applications. Each construction loan had a one-year term.

131.    Plaintiffs could only qualify for the permanent mortgage financing to which the construction loans would convert and thus were forced to convert the construction loans to permanent loans with the Defendant lenders.

132.    Contrary to the representations of the PCI/BUILD A HOME TEAM the monthly rental rates for the homes are significantly less than the monthly mortgage and other expenses associated with maintaining the properties, which mortgage outlays and other expenses are well in excess of the ability of the Plaintiffs to fund on a going forward basis.

133.    As a result, Plaintiffs risk losing their properties in foreclosure proceedings.

### CLASS ALLEGATIONS

134.    The Plaintiffs bring this action on behalf of a class of all other persons or entities similarly situated, pursuant to Rule 23 of the Federal Rules of Civil Procedure. The proposed class is defined to include: All persons who received the "Cape Coral Millionaire" prospectus and thereafter purchased properties from PCI/BUILD A HOME TEAM in Cape Coral, Florida for investment purposes.

135.    There are questions of law and fact that are common to all members of the purported class, which questions predominate over any question affecting only individual class members.

136.    The principal common issues include the following:

            a.      whether Defendants violated the federal securities laws by inducing purported class members to purchase investment properties from PCI/BUILD A HOME TEAM based upon false and misleading representations contained in the Prospectus and in oral communications with the Plaintiffs and class members;

            b.      whether Defendants violated the Interstate Land Sales Full Disclosure Act by inducing purported class members to purchase investment properties from

PCI/BUILD A HOME TEAM based upon false and misleading representations contained in the Prospectus and in oral communications;

c.      whether Defendants' actions also constitute deceptive and unfair trade practices, in violation of Sections 501.201 to 501.213, Florida Statutes;

d.      whether PCI/BUILD A HOME TEAM breached their contractual obligations to purported class members failing to obtain tenants for the purchased properties..

137.    In this case, there is no question as to the identification of class members because the class is comprised of all persons who received the "Cape Coral Millionaire" prospectus from PCI/BUILD A HOME TEAM and thereafter purchased one or more real properties from PCI/BUILD A HOME TEAM in Cape Coral, Florida for investment purposes.

138.    The claims of the Plaintiffs are typical of the claims of all the members of the purported class because all claims are based on the same legal and remedial theories.

139.    The Plaintiffs will fairly and adequately protect the interests of all purported class members in the prosecution of this action and in the administration of all matters relating to the claims stated herein. The Plaintiffs are similarly situated with, and have suffered similar injuries as, the members of the purported class that they seek to represent. The Plaintiffs feel that they have been wronged, wish to obtain redress of the wrong and want the defendants stopped from reaping ill- gotten gains. To that end, Plaintiffs have retained counsel experienced in class action cases and trial work in general. Neither the Plaintiffs, nor counsel, have any interest that may cause them not to vigorously pursue this action.

140.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because:

a.      the individual class members are not all aware that they have been wronged and are thus unable to prosecute individual actions;

b.      concentration of the litigation concerning this matter in this Court is desirable and will further the efficient administration of justice in this case;

c.      the claims of the representative plaintiffs are typical of the claims of the members of the purported class;

d.      a failure of justice will result from the absence of this class action;

e.      the purported class and the difficulties likely to be encountered in the management of this class action would not be burdensome to the Court.

141.    The purported class is so numerous as to make it impracticable to join all members of the class as plaintiffs. Upon information and belief, at least 100 investment properties have been sold by PCI/BUILD A HOME TEAM to persons or entities who received the "Cape Coral Millionaire Opportunity" prospectus, and then financed the acquisition of such properties through interim construction loans arranged by PCI/BUILD A HOME TEAM. Many class members, who are from all over the state of Florida and from various states within the United States, may not even be aware of the extent of Defendants' wrongdoing and the amount in controversy would be too small to justify the expense of individual litigation in the State of Florida. In contrast, on a class-wide basis, Defendants have reaped huge monetary gains through their unlawful acts and omissions.

142.    Plaintiffs have retained the undersigned law firm and have agreed to pay said firm a reasonable attorney's fee.

143.    Plaintiffs have performed all conditions precedent to the relief requested in this action or said conditions have been waived or excused.

## COUNT I
## VIOLATION OF SECTION 12(a)(2) OF THE SECURITIES ACT
### (Asserted against PCI/BUILD A HOME TEAM)

144. Plaintiffs repeat and reallege their allegations contained in Paragraphs 1 through 143 above as if fully set forth herein.

145. The real estate investment opportunity described in the Prospectus was an offer to sell securities.

146. Defendant PCI/BUILD A HOME TEAM is a "seller" within the meaning of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 771(a)(2), because title in the subject real estate investment properties was passed directly from PCI/BUILD A HOME TEAM to the Plaintiffs and/or because PCI/BUILD A HOME TEAM solicited Plaintiffs' purchase of the subject real estate investment opportunities.

147. Defendant PCI/BUILD A HOME TEAM is a "seller" within the meaning of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 771(a)(2), because it solicited Plaintiffs ' purchase of the subject securities.

148. Each of the above-named Defendants, directly and indirectly, by use of the means or instruments of transportation or communication in interstate commerce and by the use of the mails, have offered to sell or sold a security by means of a prospectus or oral communication, which included untrue statements of material facts and omissions to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading.

149. By reason of the foregoing, the above-named Defendants have directly and indirectly, violated Section 12(a)(2) of the Securities Act, 15 U.S.C. § 771(a)(2).

150. Plaintiffs and the purported class they seek to represent have suffered damages as a result of the Defendants' violations of Section 12(a)(2) of the Securities Act.

## COUNT II
## CONTROLLING PERSON LIABILITY UNDER
## SECTION 15(A) OF THE SECURITIES ACT
### (Asserted against ECKENROTH and CHRIS )

151.   Plaintiffs repeat and reallege their allegations contained in Paragraphs 1-143 above as if fully set forth herein.

152.   By reason of the foregoing, PCI/BUILD A HOME TEAM has directly or indirectly violated Section 12(a)(2) of the Securities Act, 15 U.S.C. § 771(a)(2).

153.   By virtue of their top-level executive positions within PCI/BUILD A HOME TEAM, Defendants ECKENROTH and CHRIS had the power to control or influence the actions of PCI/BUILD A HOME TEAM.

154.   Defendants ECKENROTH and CHRIS were culpable participants in the fraudulent scheme described herein (for which PCI/BUILD A HOME TEAM is liable) and caused PCI/BUILD A HOME TEAM to engage in the acts and omissions which give rise to liability under Section 12(a)(2) of the Securities Act.

155.   As top-level executives and controlling persons of PCI/BUILD A HOME TEAM, ECKENROTH and CHRIS knew of or recklessly disregarded the alleged misrepresentations to Plaintiffs made by PCI/BUILD A HOME TEAM.

156.   Accordingly, Defendants ECKENROTH and CHRIS are "controlling persons" of PCI/BUILD A HOME TEAM within the meaning of Section 15(a) of the Exchange Act, 15 U.S.C. § 77(o).

157.   Plaintiffs and the purported class they seek to represent have suffered damages as a result of Defendants' violation of Section 15(a) of the Securities Act.

## COUNT III
## FRAUD IN VIOLATION OF SECTION 10(b) OF THE
## EXCHANGE ACT AND RULE 10b-5 THEREUNDER
### (Asserted against PCI/BUILD A HOME TEAM,
### ECKENROTH and CHRIS)

158.    Plaintiffs repeat and reallege their allegations contained in Paragraphs 1-143 above as if fully set forth herein.

159.    Each of the above-named Defendants have directly and indirectly, by use of the means and instrumentality of interstate commerce, and of the mails in connection with the purchase or sale of the securities, as described in this Complaint, knowingly, willfully or recklessly:

        a.    employed devices, schemes or artifices to defraud;

        b.    made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or

        c.    engaged in acts, practices and courses of business which have operated as a fraud upon the purchasers of such securities.

160.    Specifically, each of the above-named Defendants described as part of the PCI/BUILD A HOME TEAM fraudulently induced the Plaintiffs and the purported members of the class they seek to represent to invest in the "PCI/BUILD A HOME PROGRAM" by making those false promises and misrepresentations to the Plaintiffs and other class members that are otherwise detailed and set forth above.

161.    In making the foregoing statements, Defendants described as part of the PCI/BUILD A HOME TEAM  acted with "scienter," that is, an intent to defraud, because, at the time they sold the subject properties to Plaintiffs, they knew that the properties being sold were overvalued and were subject to numerous fees and charges further diminishing the properties' value.

162.   The PCI/BUILD A HOME TEAM has unjustly profited from the sale of properties to Plaintiffs and the purported class members they seek represent through the fraudulent representations described above.

163.   Each Defendant has also profited from the sale of properties by PCI/BUILD A HOME TEAM to Plaintiffs and other purported class members they seek to represent as a result of the fraudulent representations described above by unjustly receiving commissions and/or fees from said sales.

164.   Plaintiffs and the other purported class members reasonably and justifiably relied on the foregoing representations in deciding to purchase the properties for investment purposes.

165.   By reason of the foregoing, the above Defendants have directly or indirectly violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j( 1), and Rule 1 Ob-5 , 17 C.F.R. § 240.

166.   Plaintiffs and the purported class they seek to represent have suffered damages as a result of Defendants' violation of Section 10(b) of the Exchange Act and Rule 1 Ob-5 thereunder.

## COUNT IV
## CONTROLLING PERSON LIABILITY UNDER
## SECTION 20(A) OF THE EXCHANGE ACT
### (Asserted against ECKENROTH and CHRIS)

167.   Plaintiffs repeat and reallege their allegations contained in Paragraphs 1-143 above as if fully set forth herein.

168.   By reason of the foregoing, PCI/BUILD A HOME TEAM has directly or indirectly violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(1), and Rule lOb-5 promulgated thereunder, 17 C.F.R. §240.

169.   By virtue of their top-level executive positions within PCI/BUILD A HOME TEAM, Defendants ECKENROTH and CHRIS are "controlling persons" of PCI/BUILD A HOME

TEAM within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), and, further, caused it to engage in the acts and omissions of PCI/BUILD A HOME TEAM that violated Section 10(b) and Rule lOb-5of the Exchange Act.

170.     As top-level executives and controlling persons of PCI/BUILD A HOME TEAM Defendants ECKENROTH and CHRIS knew of or recklessly disregarded the alleged misrepresentations made by PCI, VILLA and the PCI/BUILD A HOME TEAM.

171.     Plaintiffs and the purported class they seek to represent have suffered damages as a result of Defendants' violation of Section 20(a) of the Exchange Act.

**COUNT V**
**FRAUD IN VIOLATION OF SECTION 1703(A)(2) OF THE**
**INTERSTATE LAND SALES FULL DISCLOSURE ACT**
**(Asserted against PCI/BUILD A HOME TEAM)**

172.     Plaintiffs repeat and reallege their allegations contained in Paragraphs 1-143 above as if fully set forth herein.

173.     This is an action pursuant to Section 1709 of the Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1709, which creates a civil remedy in favor of purchasers of land against developers and their agents who violate the Act's requirements, including by, inter alia, making any untrue statements or omissions of material fact in connection with the sale of land.

174.     PCI/BUILD A HOME TEAM is a "developer" within the meaning of §1701(4) of the Interstate Land Sales Full Disclosure Act since it directly or indirectly sold or offered to sell, or advertised for sale, more than 100 undeveloped lots as part of the common promotional plan known as the "PCI/BUILD A HOME PROGRAM".

175.     Defendants CHRIS, PATRICIA, RICHARD, STEPHEN, ECKENROTH acted as "agents" of PCI/BUILD A HOME TEAM in connection with the sale and offer of sale of the lots.

176.    Each of the above-named Defendants have directly and indirectly, by use of the means or instruments of interstate commerce or communications in interstate commerce and of the mails, in connection with the sale or offer to sell any lot, (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made and within the context of the overall offer and sale, not misleading with respect to any information pertinent to the lot or subdivision; and/or (c) engaged in acts, practices and courses of business which have operated as a fraud upon the purchasers of such securities.

177.    Specifically, the above-named Defendants fraudulently induced the Plaintiffs and the purported members of the class they seek to represent to invest in the "PCI/BUILD A HOME PROGRAM" making those false promises and misrepresentations to the Plaintiffs and other class members that are otherwise detailed and set forth above.

178.    At the time they made these representations, each of the above-named Defendants knew that the representations were false and unsustainable.

179.    By reason of the foregoing, Defendants have directly or indirectly violated Section 1703 (a)(2) of the Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1703(a)(2).

180.    Plaintiffs and the class they seek to represent have suffered damages as a result of Defendants' violation of Section 1703(a)(2) of the Interstate Land Sales Full Disclosure Act.

### COUNT VI
### BREACH OF CONTRACT
#### (Asserted against PCI/BUILD A HOME TEAM)

181.    Plaintiffs repeat and reallege their allegations contained in Paragraphs 1 through 143 above as if fully set forth herein.

182.   The PCI/BUILD A HOME TEAM offered Plaintiffs and other class members an opportunity to purchase investment property as part of the "PCI/BUILD A HOME PROGRAM".

183.   Plaintiffs and the other class members accepted the offers of both PCI/BUILD A HOME TEAM by entering into agreements for the purchase of the various properties.

184.   Plaintiffs and the other class members paid consideration pursuant to the terms of the various contracts.

185.   The PCI/BUILD A HOME TEAM breached their contractual promise to provide Plaintiffs and other class members to "help you …sell the property and turn it around for a profit."

186.   As a consequence of the foregoing, Plaintiffs and the members of the purported class they seek to represent have suffered substantial damages, including, but not limited to, the complete loss of their investment, the possible foreclosure of their investment property and the prospect of a deficiency judgment rendered against them in state court proceedings.

## COUNT VII
## BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING
### (Asserted against PCI/BUILD A HOME TEAM)

187.   Plaintiffs repeat and reallege their allegations contained in Paragraphs 1-143 above as if fully set forth herein.

188.   Defendants' actions also constitute a breach of the implied duty of good faith and fair dealing inherent in every contract by failing to use good faith and best efforts to procure tenants to rent (and then purchase) the various properties that Plaintiffs and other class members had purchased as part of the "PCI/BUILD A HOME PROGRAM".

189.   As a consequence of the foregoing, Plaintiffs and the other members of the purported class they seek to represent have suffered substantial damages, including, but not limited

to, the complete loss of their investment, the foreclosure of their investment property and the prospect of a deficiency judgment rendered against them in state court proceedings.

## COUNT VIII
## DECEPTIVE AND UNFAIR TRADE PRACTICES
### (Asserted against All Defendants)

190.   Plaintiffs repeat and reallege their allegations contained in Paragraphs 1 through 143 above as if fully set forth herein.

191.   The foregoing conduct also constitutes a violation of the Florida Deceptive and Unfair Trade Practices Act (the "FDUTPA"), Florida Statutes, § 501.201 et seq. Defendants' scheme to sell real estate based upon their false and fraudulent promises constitutes unfair or deceptive acts or practices in the conduct of any trade or commerce. Such practices are likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment.

192.   Defendants' above-described conduct was willful because they knew or should have known that their conduct was unfair or deceptive or otherwise prohibited by statute or rule.

193.   Plaintiffs and other class members they purport to represent have been damaged as a result of Defendants' unlawful and deceptive trade practices.

## COUNT IX
## PROHIBITED PRACTICES
### [Fl. Stat. §475.25(b)]
## FRAUD AND MISREPRENTATION
### (Asserted against CHRIS and the CANZANOS)

194.   Plaintiffs repeat and reallege their allegations contained in Paragraphs 1 through 143 above as if fully set forth herein.

195. The Defendants have made statements which were false and which they knew or should have known were false or omitted the disclosure of facts which they should have disclosed including but not limited to :

    a.    Defendants failed to disclose that these "instant equity" properties had been listed on the market for extended periods of time;

    b.    The Defendants failed to disclose that the properties did not possess "instant equity";

    c.    The Defendants failed to disclose that the "formula" for their "program" was at best, highly speculative in nature and was premised upon the acceptance of many underlying assumptions, none of which they disclosed to Plaintiffs.

    d.    The Defendants misrepresented the condition of the market in Lee County;

    e.    The Defendants misrepresented the then value and future value of the proposed properties;

    f.    The Defendants misrepresented rental values in the area;

    g.    The Defendants misrepresented the bases for differing values from one property to the other;

    h.    The Defendants failed to disclose that they were charging and/or collecting fees, expenses and/or disguised profits beyond real estate commissions or failed to disclose the full scope of the commissions they were receiving;

i.    The Defendants failed to disclose material facts regarding the properties that would have affected and reasonably would have been expected to affect the Plaintiffs' decisions.

196.    At all times material hereto, the Plaintiffs reasonably relied upon the statements or reasonably inferred from the omissions of Defendants as was the intention of Defendants.

197.    The Defendants profited from their false statements and the Plaintiffs suffered damages.

198.    The foregoing conduct constitutes violation of F.S.A. §475.25(b) inasmuch as Defendants have committed fraud, have misrepresented themselves, have engaged in negligence so gross as to rise to the level of culpable negligence and have breached the trust placed in them by Plaintiffs conferred in part under the authority granted them by Chapter 475, Florida Statutes.

## COUNT X
### PROHIBITED PRACTICES
### [Fl. Stat. §475.25(b)]
### CULPABLE NEGLIGENCE
### (Asserted against CHRIS and the CANZANOS)

199.    Plaintiffs repeat and reallege their allegations contained in Paragraphs 1 through 143 above as if fully set forth herein.

200.    The Defendants at all times material hereto owed a duty to Plaintiffs to, *inter alia*, deal honestly and fairly with Plaintiffs.

201.    Defendants failed to discharge their duty and conducted themselves with willful disregard for their duty or with such a degree of negligence as willful disregard may be inferred from their conduct as a result of conduct including but not limited to:

    a.       Failing to perform due diligence on the properties recommended to Plaintiffs;

    b.       Failing to warn Plaintiffs regarding the risks of investing in the manner being proposed by Defendants;

    c.       Failing to provide Plaintiffs with information which they reasonably would have been expected to be provided in order for them to make informed decisions;

    d.       Failing to perform adequate investigation into the Lee County market and to adequately communicate that information to Plaintiffs;

    e.       Failing to warn Plaintiffs regarding the use of a particular appraiser; and

    f.       Failing to advise Plaintiffs that the appraisal should not have been a reliable indicator of value for investment purposes.

202.    As a results of Defendants' conduct, Plaintiffs have suffered damages

203.    The foregoing conduct constitutes violation of F.S.A. §475.25(b) inasmuch as Defendants have engaged in negligence so gross as to rise to the level of culpable negligence and have breached the trust placed in them by Plaintiffs conferred in part under the authority granted them by Chapter 475, Florida Statutes.

## COUNT XI
## FAILURE TO MANAGE
### [Fl. State. §475.25(u)]
### (Asserted against CHRIS)

204.    Plaintiffs repeat and reallege their allegations contained in Paragraphs 1 through 143 above as if fully set forth herein.

205.    The Defendant CHRIS at all times material hereto failed to direct, control, or manage a broker associate or sales associate employed by such broker.

206.    As a results of Defendant CHRIS' conduct, Plaintiffs have suffered damages

207.    The foregoing conduct constitutes violation of F.S.A. §475.25(u), Florida Statutes.

## COUNT XII
## CIVIL CONSPIRACY
### (Asserted against all Defendants)

208.    Plaintiffs repeat and reallege their allegations contained in Paragraphs 1 through 143 above as if fully set forth herein.

209.    At all times material hereto, Defendants engaged in a pattern of conduct and in concert with each other and conspired, combined or confederated with each other to commit unlawful practices under State and Federal law.

210.    The Defendants committed the overt acts alleged herein in furtherance of their conspiracy;

211.    Plaintiffs suffered damages as a result.

## COUNT XIII
## NEGLIGENCE
### (Asserted against NATIONAL CITY, MARKET STREET, COAST, UNITED, AND JM )

212.    Plaintiffs repeat and reallege their allegations contained in Paragraphs 1 through 143 above as if fully set forth herein.

213.    The Defendants at all times material hereto owed a duty to Plaintiffs.

214.    Defendants failed to discharge their duty and conducted themselves with willful disregard for their duty or with such a degree of negligence as willful disregard may be inferred from their conduct as a result of conduct including but not limited to:

    a.      Failing to perform due diligence with regard to the loans that were being provided and/or closed;

    b.      Failing to properly examine the title commitment or failing to accurately depict the correct owner on title;

    c.      Permitting deviation from standard loan closing practices;

    d.      Deviating from standard loan closing practices;

    e.      Funding upon loans which should not have been funded upon;

    f.      Failing to supervise or evaluate appraiser(s);

    g.      Permitting and/or drafting HUD-1 Closing statements which are materially false or misleading or failed to adequately communicate to Plaintiffs the flow of monies on the transaction;

    h.      The failure to disclose or require the disclosure to Plaintiffs of payments being made to third parties not represented on the HUD-1 Closing Statement(s);

    i.      Failing to provide Defendants with information which they reasonably would have been expected to be provided in order for them to make an informed decision;

    j.      Failing to perform adequate investigation into the Lee County market and to adequately communicate that information to Plaintiffs;

    k.      Failing to advise Plaintiffs that the appraisal should not have been a reliable indicator of value for investment purposes

215.    As a results of Defendants' conduct, Plaintiffs have suffered damages.

## COUNT XIV
## PERSONAL LIABILITY
### (Asserted against JAMES AND MICHAEL)
### [Florida Statute §626.734]

216.    Plaintiffs repeat and reallege their allegations contained in Paragraphs 1 through 143 above as if fully set forth herein.

217.    At all times material hereto, Defendants were upon information and belief licensed as Florida Title Agents or were shareholders, officers and/or directors of a licensed title insurance agency.

218.    As a result of Defendants' licensure as Florida licensed title insurance agents, Defendants were subject to the Florida Insurance Code (Chap. 626. _et. seq._).

219.    Defendants committed wrongful acts, misconduct, violations of provisions of the code by themselves or by persons under their direct supervision or control while acting on behalf of the corporation.

220.    This is an action to impose personal liability upon Defendants pursuant to the authority conferred by Florida Statute §626.734.

221.    Plaintiffs suffered damages.

## XV
## PROHIBITED PRACTICES
### [FLORIDA STAT. §494.0025(4) and (5)]
### (Asserted against NATIONAL CITY, UNITED, JM , COAST, MARKET STREET)

222.    Plaintiffs repeat and reallege their allegations contained in Paragraphs 1 through 143 above as if fully set forth herein.

223.    The Defendants at all times material hereto were licensees under Chapter 494 _et seq._, Florida Statutes.

224.   At all times material hereto, the Defendants knowingly or willfully employed a device, scheme or artifice to defraud or engaged in a transaction, practice or course of business which operated as a fraud upon Plaintiffs in connection with the purchase or sale of a mortgage loan; or

225.   Defendants obtained property, to wit, monies paid by Plaintiffs by fraud, willful misrepresentation of a future act or false promise;

226.   Defendants further knowingly or willfully concealed, falsified or covered up by trick, scheme or device, material facts, made false or fraudulent statements or representations, or made or used any false writing or document, knowing the same to contain false or fraudulent statements or entries.

227.   As a results of Defendants' conduct, Plaintiffs have suffered damages

## XVI
## PROHIBITED PRACTICES
## [FLORIDA STAT. §475.42(O)]
### (Asserted against CHRIS CANZANO AND THE CANZANOS)

228.   Plaintiffs repeat and reallege their allegations contained in Paragraphs 1 through 143 above as if fully set forth herein.

229.   The Defendants disseminated false or misleading information for the purpose of offering for sale, or for the purpose of causing or inducing any other person to purchase, lease or rent, real estate located in the state or for the purpose of causing or inducing any other person to acquire an interest in the title to real estate located in the state.

## XVII FRAUDULENT ACTS
## [FLORIDA STATUTE §498.022]
### (Asserted against VILLA, CHRIS, ECKENROTH, THE CANZANOS, JM, BAYVIEW, MICHAEL, CHARLES, ALICE AND JAMES)

230.    Plaintiffs repeat and reallege their allegations contained in Paragraphs 1 through 143 above as if fully set forth herein.

231.    Upon information and belief, the Defendants offered or disposed of five or more lots, parcels, units or interests in a subdivision and obtained money or property by means of one or more false statements of a material fact, or the failure to state a material fact which makes the statement misleading in light of the circumstances and the context of the overall transaction with respect to any information pertinent to the transaction.

232.    Defendants engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon a purchaser;

233.    Defendants knowingly made false statements or representations or made use of any false writing or document knowing the same to contain any false fictitious or fraudulent statement or entry.

234.    Defendants falsified, concealed, or covered up, by a trick, scheme, or device, material facts;

235.    Defendants further, in their offerings statements falsified or omitted material facts required to be stated.

## XVIII
## PROHIBITED ACTIVITIES
### [FLORIDA STATUTE §772.103]
### Asserted against ALL DEFENDANTS

236.    Plaintiffs repeat and reallege their allegations contained in Paragraphs 1 through 143 above as if fully set forth herein.

237.    The Defendants, with criminal intent, received proceeds derived, directly or indirectly, from a pattern of criminal activity or the proceeds derived from the investment or use

thereof, in the acquisition of any title to, or any right, interest, or equity in, real property or in the establishment or operation of any enterprise.

238. The Defendants have further conspired to violate Florida Statute §772.103(1) & (2).

WHEREFORE, Plaintiffs and the purported class demand the following relief:

     a.    that the Court certify the case as a class action and appoint the Plaintiffs as class representatives and Plaintiffs' counsel as class counsel;

     b.    that judgment be entered against Defendants in the amount of their damages incurred with interest thereon, including Plaintiffs' reasonable attorneys' fees and costs;

     c.    for punitive and/or exemplary damages; and

     d.    that this Court order such other relief as it deems just and proper, including, but not limited to, rescission of the subject purchase agreements and the return of each purchaser's down payment or contract deposit (as well as any other monies paid to Defendants), the expungement of any and all adverse credit reporting regarding Plaintiffs to any credit reporting agencies and that the Defendants perform any and all necessary acts to remove and expunge any adverse credit reports that may have resulted from any delinquencies, defaults, foreclosures, or other negative consequences Plaintiffs may have suffered as a result of the acts or omissions of Defendants as alleged herein.

## JURY TRIAL DEMAND

Plaintiffs hereby request a jury trial on all causes of actions asserted in this Complaint.

Charlip Law Group, LC
Harrison Executive Centre, 1930 Harrison Street, Suite 208, Hollywood FL 33020

Dated: May 1, 2008

Respectfully submitted,

Charlip Law Group, LC
Attorneys for Plaintiffs
Harrison Executive Centre
1930 Harrison Street, Suite 208
Hollywood, FL 33020
Tel: (954) 921-2131
Fax: (954) 921-2191

By: _____
     David H. Charlip, Esq.
     FL Bar No.: 329932